UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

GE XIONG,                                              CIVIL NO. 13-396 (DWF/JSM)

     Plaintiff,

v.                                                     REPORT AND RECOMMENDATION

CAROLYN W. COLVIN,
Commissioner of Social Security,

     Defendant.

JANIE S. MAYERON, United States Magistrate Judge.

The above matter is before the undersigned United States Magistrate Judge on plaintiff's Motion for Summary Judgment [Docket No. 9] and defendant's Motion for Summary Judgment [Docket No. 11]. This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

For the reasons discussed below, it is recommended that plaintiff's Motion for Summary Judgment be **DENIED** and that defendant's Motion for Summary Judgment be **GRANTED**.

I.     **PROCEDURAL BACKGROUND**

On July 27, 2010, plaintiff GE Xiong filed an application for disability insurance benefits, alleging disability since August 1, 2009, due to seizures and cirrhosis of the liver. See Social Security Administrative Record [Docket No. 8] ("Tr."), 63, 149-52. Xiong's applications were denied initially and upon reconsideration. Tr. 63-65. At Xiong's request, an administrative hearing was held on April 16, 2012, before Administrative Law Judge Mary Kunz ("ALJ"). Tr. 26, 80. Xiong was represented during the hearing. Tr. 28. Testimony was taken at the hearing from Xiong, medical

expert Dr. Andrew Steiner, M.D. ("ME"), and vocational expert Robert Brzezinski ("VE"). Tr. 27. The ALJ issued a decision on April 26, 2012, finding that Xiong was not disabled under sections 216(i) and 223(d) of the Social Security Act. Tr. 9-18. Xiong filed a request for review of the ALJ's decision with the Appeals Council, the Appeals Council denied Xiong's request for review and upheld the ALJ's decision denying disability insurance benefits to Xiong (Tr. 1-5), making the ALJ's findings the final decision of defendant. See 42 U.S.C. § 405(g).

Xiong has sought review of the ALJ's decision by filing a Complaint with this Court pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). [Docket No. 1]. The parties now appear before the Court on cross-motions for summary judgment [Docket Nos. 9 and 11].

## II.    PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded. The Social Security Administration shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 1382c(a)(3)(A). The claimant's impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B). The impairment must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A); see also 20 C.F.R. §§ 404.1509, 416.909.

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision. 20 C.F.R. §§ 404.907-09, 416.1407-09. A claimant

who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ.   42 U.S.C. §§ 405(b)(1), 1383(c)(1); 20 C.F.R. §§ 404.929, 416.1429.   To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education and work experience.   See 20 C.F.R. §§ 404.1520, 416.920; see also Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); 42 U.S.C. § 1382(a).  .   The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003).

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic.  20 C.F.R. §§ 404.967-404.982, 416.1467-1482.  The decision of the Appeals Council (or of the ALJ, if the request for review is denied) is final and binding upon the claimant unless the matter is appealed to Federal District Court within sixty days after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps.  The Court is required to review the administrative record as a whole and to consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of plaintiff's impairments.

6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairment.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

The review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Bradley v. Astrue, 528 F.2d 1113, 1115 (8th Cir. 2008); Johnson v. Apfel, 210 F.30 870, 874 (8th Cir. 2000); Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996). "We may reverse and remand findings of the Commissioner only when such findings are not supported by substantial evidence on the record as a whole." Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000) (citation omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to

support the Commissioner's conclusion." Buckner, 213 F.3d at 1012 (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)); see also Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009) (citing Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)) (same); Cox v. Apfel, 160 F.3d 1203, 1206-07 (8th Cir. 1998) (same).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson, 30 F.3d at 939. The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. Buckner, 213 F.3d at 1011; Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Apfel, 811 F.2d 1195, 1199 (8th Cir. 1987); see also Heino v. Astrue, 578 F.3d 873, 878 (8th Cir. 2009) (quoting Jackson v. Bowen, 873 F.2d 1111, 1113 (8th Cir. 1989)) (same).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity. See Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir.

2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004); Martonik v. Heckler, 773 F.2d 236, 239 (8th Cir. 1985).

## III.    DECISION UNDER REVIEW

The ALJ made the following determinations under the five-step procedure.   At step one, the ALJ found that Xiong had engaged in substantial gainful activity during the period of October of 2009, December of 2009 and April of 2010.  Tr. 11 (citing Tr. 153-57).  However, because there a continuous 12-month period(s) during which the Xiong did not engage in substantial gainful activity, the ALJ found that her findings address the period Xiong did not engage in substantial gainful activity.  Id.

At the second step, the ALJ found that Xiong had severe impairments of obesity, seizure-like activity, insulin dependent diabetes, alcoholic cirrhosis, chronic anemia secondary to gastric bleeding and pancytopenia, chronic renal disease, depression, anxiety, and a history of alcoholism.  Id.

At the third step of the evaluation, the ALJ determined that Xiong did not have an impairment or combination of impairments that met or equaled the relevant criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Tr. 12-14.  With regard to Xiong's physical impairments, the ALJ relied on the testimony of the ME who testified: (1) that Xiong's diabetes was under reasonably good control and was not associated with any ongoing deficits (citing Tr. 480, 652, 876); there was no good evidence that Xiong's seizure activity was anything other than infrequent and was probably mainly related to other medical conditions, which have been addressed successfully; and (3) Xiong's liver condition was not at a listing level of documentation. Tr. 12.  In addition, pursuant to SSR 02-1p, the ALJ considered the effect of the Xiong's obesity to determine if there were any combined effects of musculoskeletal, respiratory

or cardiovascular impairments that could be evaluated under Listings Sections 1.00, 3.00 and 4.00, but concluded that these impairments did not reach the degree of severity contemplated by the Listings.  Id.

As it related to Xiong's mental impairments, the ALJ determined that the severity of his mental impairments, considered alone and in combination, did not meet or medically equal the criteria of Listings 12.04 (Affective Disorders), 12.06 (Anxiety), and 12.09 (Substance Addiction).  Id.  First, the ALJ found that Xiong did not satisfy the "paragraph B" criteria of at least two marked restrictions in the following areas: activities of daily living; social functioning; concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  Tr. 12-13.  For activities of daily living, the ALJ found that Xiong had a mild restriction.  Tr. 13.  The ALJ made this finding based on Xiong's Adult Function Report, which reflected he did not have problems with performing personal care tasks, (Tr. 214); he needed reminders to take care of personal needs or grooming, (Tr. 218); he did not prepare his own meals or do housework (Tr. 218); he walked or rode in a car, (Tr. 219); he shopped in stores, (Tr. 218); he went to a gym, used the gym machines and walked,  (Tr. 425, 1043); he did some yard work, (Tr. 1051); and he walked daily for exercise, (Tr. 1067).  Tr. 13.

As to social functioning, the ALJ found that Xiong had mild difficulties based on the records reflecting that he was under stress from a difficult divorce and he reported that he has problems getting along with others, (Tr. 221, 1039-1127); he spent time with others; socialized with friends, and talked on the phone with relatives once or twice per week, (Tr. 220); he traveled to California for the funeral of General Pang Pao and saw many friends and people he knew from the Vietnam War at the funeral, (Tr. 1071); and he stayed in touch with his friends, (Tr. 987).  Tr. 13.  In addition, Xiong testified that he

borrowed money from relatives and received assistance from his uncle on a regular basis. Id.

With regard to concentration, persistence or pace, the ALJ found that Xiong had moderate difficulties. Id. The ALJ made this finding based Xiong's reports in his Adult Function Report that he was able to count change and handle a savings account but could not pay bills or handle a checking account, (Tr. 219); he watched television daily and exercised, (Tr. 220); he did not need reminders to go places, (Tr. 220); and he reported problems with memory, completing tasks, concentration, and understanding, (Tr. 221); medical records from April 2010 and August 2011 reflecting that he was alert and oriented, (Tr. 294, 789); and treatment records from Xiong's therapist that did not contain any indication that he was unable to concentrate during the sessions or understand treatment goals, (Tr. 980, 987 1065-66). Tr. 13.

The ALJ also found that the evidence in the record failed to establish the presence of the "paragraph C" criteria, as the record did not reflect evidence of either repeated episodes of decompensation, a residual disease process that resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause decompensation; a current history of one or more years' inability to function outside a highly supportive living arrangement; or a complete inability to function independently outside the area of one's home. Tr. 14.

Before reaching step four of the analysis, the ALJ found that Xiong had the residual functional capacity ("RFC") to perform light work, as defined in 20 CFR 404.1567(b), and that he could lift up to 20 pounds occasionally and 10 pounds frequently; he could walk or stand six hours and sit two hours in an 8-hour work day; he should not be exposed to unprotected heights or hazards; and he was restricted to

routine, repetitive, simple work.  Tr. 14.  In reaching this RFC, the ALJ took into account Xiong's claims that he was unable to work because of bloody stools, weakness resulting in an inability to walk more than around the house, an inability to stand more than 10 minutes or to sit more than 30 minutes, seizures three to four times a week, blurred vision, and a heavy head due to side effects from his medications.  Tr. 15.  The ALJ also considered Xiong's claims that he would experience symptoms with heavy lifting or prolonged walking or standing, and reduced the RFC to accommodate these limitations. Id.  Seizure precautions were also included in the RFC.  Id.

The ALJ did not find Xiong's assertion that he was unable to work credible because of significant inconsistencies in the record as a whole.  Id.  First, the ALJ concluded that the objective medical record was inconsistent with the degree of limitations claimed by the Xiong, relying on the ME's testimony that Xiong's seizures were improved after his first seizure-like activity in July 2010, were stable on medication but that compliance on medications had been problematic, (Tr. 488, 513, 516, 653, 661, 832, 950, 1077, 1126); the seizure activity secondary to diabetic ketoacidosis[1] was successfully treated for renal failure, (Tr. 359); there were no confirmatory reports of repeated seizures, (Tr. 290, 758, 792, 867, 1043, 1045, 1053, 1066, 1074, 1077, 1107); and neurological examinations had been normal, (Tr. 568, 1083, 1093).  Tr. 15.

The ALJ also noted that the ME determined that Xiong showed questionable compliance with his diabetes management.  Id. (citing Tr. 935).

Additionally, relying on the ME's opinion, the ALJ found that while there was evidence of alcoholic cirrhosis with abnormal liver function markers, there was no overt

---

[1]   "Ketoacidosis" means "[a]cidosis.  As in diabetes or starvation, caused by enhanced productions of ketone bodies.  Stedman's Medical Dictionary, 1092 (27th ed. 2000).

liver decompensation, and only mild changes had been seen on a liver biopsy.  Id. (citing Tr. 360, 563, 740).  The ALJ also found that the medical record supported the finding that Xiong has chronic renal disease without overt renal failure. Id. (citing Tr. 319, 371, 373).  As to Xiong's anemia, secondary to his gastric bleeding, the ALJ relied on the ME's testimony that more recently Xiong's hemoglobin had risen and was stable. Id. (citing Tr. 952-53).

Second, the ALJ took into account Xiong's obesity by limiting him to a light RFC. Id. (citing Tr. 431, 880).

Third, the ALJ considered Xiong's mental impairments, and found that the objective record relating to the mental impairments showed therapy related to stress, primarily secondary to the breakup of his marriage and financial troubles, but that there were no mental examinations demonstrating any cognitive or social limitations, and Xiong was encouraged to be more physically and socially active by his therapist.  Tr. 16 (citing Tr. 1065).

Fourth, the ALJ noted that Xiong had a steady work history, but had made no attempt to return to work.  Id. (citing Tr. 170-75)).

Fifth, the ALJ examined Xiong's claim that his noncompliance with treatment and medications were due to his inability to afford treatment, (Tr. 418, 994, 1045, 1047, 1126), and his assertion that he did not engage in many daily activities.  Tr. 16.  The ALJ indicated that Xiong's claim that he could not afford medications was contradicted by the fact that he borrowed money from relatives for many other expenses and he received $850 dollars a month from his ex-wife.  Id.  Further, the ALJ pointed to Xiong's reports that he was staying in touch with friends and was very happy about that.  Id. (citing Tr. 987).

Sixth, the ALJ found Xiong's claims about is daily activities, including that he could not take care of himself were not supported by the medical record and were contradicted by his activities, including travelling to Bally's gym to use their machines, walking for two hours twice a week, walking every night for one-and one-half miles, doing yard work, and going to California for the funeral of General Pang Pao where he met many friends and people who he knew from the war. Id. (citing 424, 1043, 1051, 1071).

Seventh, the ALJ also did not find Xiong's claim that he could not speak or understand English credible. Tr. 16. Xiong spoke through an interpreter at the hearing, but in the previous hearing, he spoke in English and was able to complete forms on his own. Id. (citing Tr. 202-123, 425).

Finally, despite Xiong's statement that he had not used alcohol since 2002, the ALJ noted that there was an issue of continued alcohol abuse by him, including returning intoxicated to a hospital. Id. (citing Tr. 325, 338, 669).

The ALJ gave the greatest weight to the opinions of the ME, given his specialization in physical medication and rehabilitation, his experience with the disability evaluation process, and his review of the entire record. Tr. 16-17. The ME's opinion was essentially consistent with the state agency physicians, which were also given great weight by the ALJ. Tr. 17 (citing Tr. 401-11,438-40).

The ALJ considered the opinion of Xiong's treating physician, Dr. Antonio Jhocson, that Xiong should not drive, and given Xiong's history of seizures, gave it weight by reflecting the limitation in the RFC of no exposure to hazards. Tr. 17. However, the ALJ gave no weight to Dr. Jhocson's opinion that Xiong could not work because of his diabetes, cirrhosis, depression and seizures, as he did not provide any

support for that conclusion, nor did he identify any limitations stemming from those conditions.  Id. (citing Tr. 650).  In addition, the ALJ gave no weight to the May 2011 opinion of treating physician, Dr. Michael Rosenbloom, that Xiong could not drive or work for the next three months based on his seizures, noting that this was temporary opinion, there were no limitations listed except as to Xiong's ability to drive, the RFC had restricted any exposure to hazards, there were no reports asserting that his seizures were frequent, and his neurological examinations had been normal.  Id. (citing Tr. 969).

Based on the RFC assigned to Xiong and the VE's testimony, the ALJ determined at the fourth step of the evaluation process that Xiong was able to perform his past relevant work as an unskilled and light production assembler as it is generally performed.  Tr. 17.

## IV.   THE RECORD

### A.   <u>Background</u>

Xiong was 52-years-old when the ALJ issued her decision.  Xiong left Laos for the United States when he was about 19 years old, and after his arrival, he finished his training as a welder.  Tr. 195.  He worked for approximately 30 years as a welder and almost a year as an assembly folder.  Tr. 195, 376.

### B.   <u>Functional Report by Xiong</u>

On August 10, 2010, Xiong filled out a report on his ability to function.  Tr. 213-14, 218-23.  Xiong indicated that he had no problem with caring for himself, although he needed reminders regarding changing his clothes, taking medication, grooming and shaving.  Tr. 214, 218.  Xiong stated that he did not prepare his own meals; when he travelled to places, he walked or rode in car; he could not drive while his seizure

condition was being evaluated; he went out weekly to shop for food; he could not pay bills; he could count change and handle a savings account; and he was unable to handle a checking account.  Tr. 218-19.  Xiong's hobbies included watching television, exercising and walking on a daily basis.  Tr. 220.  With regard to social activities, Xiong indicated that he socialized with friends and talked with relatives once or twice a week, and he visited a flea market and shopped every two to three weeks.  Id.  Xiong claimed that he had a short temper, could not handle stress, could not go out with friends and family, could not get along with his boss like he used to do, and had problems with handling changes in his routine.  Tr. 221, 222.  Xiong complained of problems with seeing, memory, completing tasks, concentration and understanding.  Tr. 221.  Xiong maintained that he could only pay attention for 3-5 minutes at a time, and had trouble following written and spoken instructions.  Id.

## C. **Medical Records**[2]

On December 31, 2009, Xiong saw Dr. Jhocson for a three-month check-up.  Tr. 372.  Dr. Jhocson noted that Xiong's sugar levels "have been well controlled."  Id.  While Xiong complained of left arm numbness and tingling, Dr. Jhocson found that the left arm was normal.  Tr. 373.  Xiong also claimed he was experiencing leg cramps.  Id.  Dr. Jhocson advised exercise and stretching to deal with the cramps.  Id. Xiong was diagnosed with diabetes mellitus type 2, hypertension, hypothyroidism and left thoracic

---

[2]    As Xiong is only challenging the determination by the ALJ regarding his mental impairment, seizure disorder, diabetes and ulcer impairment in his motion for summary judgment, and did not refer to any facts regarding his other physical ailments or symptoms, this Court has not included in its description of the medical records the reports from medical providers regarding other illnesses and issues for which he sought treatment.  Any claim regarding his other physical impairments are waived.  See Craig v. Apfel, 212 F.3d 433, 437 (8th Cir. 2000); see also Yeazel v. Apfel, 148 F.3d 910, 911-12 (8th Cir.1998) (citing Roth v. G.D. Searle & Co., 27 F.3d 1303, 1307 (8th Cir. 1994) (finding failure to raise an issue before this Court results in waiver of that argument)).

outlet syndrome.  Tr. 373.  Dr. Jhocson advised Xiong to return in three months, or to return earlier if his symptoms worsened or failed to improve as anticipated.  Tr. 374.

On March 22, 2010, Xiong saw Dr. Jhocson relating to complaints of weight loss, and feeling dizzy at his work at the post office when leaning down and working on low bins.  Tr. 370.  Xiong believed that his weight loss was due to his thyroid medication.  Id. The gastrointestinal, musculoskeletal, neurological and psychiatric review of Xiong was negative.  Id.  Xiong was found to have a low blood count, an elevated liver test with an unknown cause, early stage kidney failure, and a normal thyroid.  Tr. 371.

An April 7, 2010, a gastrointestinal upper endoscopy showed a "normal stomach" with mild inflammation of the small bowel that "should respond to the stomach medicine."  Tr. 294-97, 379-80, 391.

On May 7, 2010, Xiong was admitted to the hospital with iron deficiency anemia. Tr. 338-45. His hemoglobin was 6.6.   Tr. 353, 344.   Xiong was given a blood transfusion.  Id.  He denied any chest pain, shortness of breath, pain, nausea, or vomiting.  Tr. 344.  He indicated that when he sat up he was dizzy for a few seconds, but that this had been occurring for the past couple of years.  Id.  Xiong had recently had an esophagogastroduodenoscopy ("EGD") that was negative.   Tr. 338, 368-69. During the assessment at the hospital, it was noted that there had been no changes in Xiong's activities of living and that he could independently eat, engage in activity and take care of his hygiene.  Tr. 349.  Xiong denied any thoughts of harming or killing himself, and the mental health assessment showed no abnormalities.  Id.  In addition, no musculoskeletal abnormalities were found.  Id.  The attending physician believed that the likely source of Xiong's anemia was chronic lower gastrointestinal bleed, but the etiology of the blood loss remained unknown.  Tr. 351, 353.  Xiong demanded to be

discharged so he could attend a cultural and religious ceremony.  Tr. 351.  He was intoxicated when he returned from the celebration.  Tr. 341, 342.

On May 17, 2010, Xiong saw Dr. Jhocson for a check-up related to his anemia.  Tr. 364.  A colonoscopy performed on May 10, 2010, only showed two polyps.  Tr. 364, 387-89.  The gastrointestinal, musculoskeletal, neurological and psychiatric review of Xiong was negative.  Tr. 365.  Xiong's hemoglobin was improved, as was his iron deficiency.  Id.  Xiong's sugar levels were not at goal levels.  Id.  On June 21, 2010, Xiong again saw Dr. Jhocson for a check-up related to his anemia.  Tr. 362.  Xiong was tolerating his medications and his sugar levels were in the 90's.  Id.  The gastrointestinal, musculoskeletal, neurological and psychiatric review of Xiong was negative.  Id.

On July 22, 2010, Xiong took an endoscopy capsule, which showed that he had gastritis with small erosions and a healing ulcer.  Tr. 292-93, 306, 386.  It was believed that gastritis with the erosions were the most likely cause of his blood loss.  Tr. 386.

On July 23, 2010, Xiong was admitted to Regions Medical Center for a reported seizure at work, and he experienced a seizure while in the emergency room.  Tr. 318, 330.  Xiong was unresponsive immediately after the seizure.  Tr. 335.  Xiong's discharge diagnosis was seizure, type II diabetes and cirrhosis.  Tr. 318.  Xiong had no previous history of seizures.  Tr. 318-19.  Xiong had no further seizures after his admission into the hospital.  Tr. 319.  Dr. Lisa Papic noted that the CT head scan showed no acute pathology of seizures and that there was no evidence diabetic ketoacidosis or infectious pathology as being a case of the seizure activity.  Tr. 303, 319, 383.  Dr. Papic believed that the seizures were secondary to Xiong's electrolyte abnormalities due to dehydration and poor oral intake over the previous days.  Tr. 319,

326.  Dr. Papic did not believe that there was neurological cause of Xiong's seizures. Tr. 327.  Dr. Papic instructed Xiong that he could resume normal activities at the time of his discharge and could return to normal work activities after his July 25, 2010 discharge.  Tr. 321.

On August 6, 2010, Xiong saw Dr. Jhocson for a follow-up visit.  Tr. 359.  Dr. Jhocson noted that Xiong was seeking social security disability benefits.  Id.  The gastrointestinal, musculoskeletal, neurological and psychiatric review of Xiong was negative.  Tr. 360.  Xiong was assessed with cirrhosis due to alcohol consumption, renal failure, recent seizures due to electrolyte imbalance and diabetes.  Id.  The lab results showed mild anemia, but that the condition had improved, and that Xiong's kidneys were normal and his blood sugar was high.  Tr. 361.  Xiong was instructed to return if his symptoms worsened or if he developed new symptoms.  Tr. 360.

On August 25, 2009, Xiong was diagnosed with cirrhosis of the liver with an unknown cause, although alcohol was suspected.  Tr. 669-71.  There were no overt complications as a result of the cirrhosis.  Tr. 669-70.  During his examination, Xiong was pleasant, well appearing and in no acute distress.  Tr. 670.  His speech was fluent and clear.  Id.  Xiong was instructed to not drink alcohol.  Tr. 671.

On September 9, 2010, Xiong saw Dr. Jhocson related to his high blood sugar levels.  Tr. 428.  The gastrointestinal, musculoskeletal, neurological and psychiatric review of Xiong was negative.  Tr. 429.  Dr. Jhocson found that Xiong's sugars were poorly controlled, but that Xiong had declined to receive insulin.  Id.

On September 13, 2010, Dr. Aaron Mark, a state agency consultant, completed a physical residual functional capacity assessment regarding Xiong for the SSA.  Tr. 404-11.  As to Xiong's exertional limitations, Dr. Mark found that Xiong could occasionally

carry and lift 20 pounds, occasionally lift and carry 10 pounds, stand or walk about six hours in a 8-hour work day, sit for six hours out of an 8-hour work day, and had an unlimited ability to push and pull.  Tr. 405.  Dr. Mark suggested a light RFC until Xiong's medical providers determined that he did not have an underlying hematological problem and on the basis of the global atrophy that appeared on a CT head scan.  Tr. 405-06.  Dr. Mark noted that Xiong had not been placed on anticonvulsants for his seizure episode.  Tr. 406.  Dr. Mark found no postural limitations for Xiong, except that he should never climb ropes or ladders, and he found no manipulative, visual or communicative limitations.  Tr. 407-08.  Dr. Mark concluded that Xiong had no environmental limitations, except that he was to avoid all exposure to limitations to hazards (i.e. machinery and heights).  Tr. 408.  As to Xiong's statements regarding his condition, Dr. Mark found these were only partially consistent with the medical records that reflected that he only had two seizures that occurred on July 23, 2010, he had no problems with personal cares, he did not cook, he did not do household chores, and he walked, shopped, exercised, watched television, and socialized.  Tr. 409.  State agency physician Dr. Charles Grant affirmed the light RFC assigned by Dr. Mark and found that Xiong's claimed symptoms were partially credible.  Tr. 439.  Dr. Grant noted that while Xiong claimed tingling of feet, he reported walking up to two miles per day.  Id.

During a consult with a pharmacist on September 21, 2010, Xiong denied experiencing any symptoms of hypoglycemia, dizziness or weakness.  Tr. 425.  He did report tingling of his feet on occasion.  Id.  He reported going Bally's gym to use the machines, walking for about two hours twice a week and walking every night one to one-and-a-half miles.  Id.

On October 6, 2010, Dr. Jhocson prescribed the anticonvulsant Keppra and injectable insulin (Lantus) to Xiong. Tr. 451. On the same date, Xiong saw a pharmacist, at which time he denied any signs or symptoms of hypoglycemia and reported walking for exercise. Tr. 422. On October 20, November 2, and November 23, 2010, Xiong was instructed to increase his Lantus dosage. Tr. 502, 514, 520.

On October 27, 2010, Xiong underwent an electroencephalogram ("EEG"). Tr. 442, 459. The EEG was abnormal and suggested a focal area of cerebral dysfunction in the left temporal lobe, and the possibility of a lowered seizure threshold existed. Tr. 442, 459, 512.

On November 1, 2010, Xiong had a head MRI performed. Tr. 448, 487, 661. The MRI showed no acute problems, mild to moderate brain atrophy that was less pronounced than in the CT scan from July 2010, and no definite structural or migrational abnormalities. Tr. 448, 487, 661.

Xiong's March 22, 2010, June 21, 2010 and August 25, 2010, A1c levels, which measured how well he controlled his glucose in the previous 12-16 weeks, were at 8.8, 5.4 and 7.0 respectively. Tr. 479, 537, 668. Dr. Jhocson found that these A1c levels were acceptable. Id.

On December 6, 2010, Xiong's A1c level was at 9%, as opposed to the goal of 6.9%. Tr. 473. Dr. Jhocson increased the dosage for Lantus. Tr. 521.

On January 5, 2011, Xiong was seen by neurologist Dr. Rosenbloom. Dr. Rosenbloom increased Xiong's dosage of Keppra. Tr. 530.

On February 15, 2011, Xiong was seen by Dr. Jhocson primarily for his diabetes. Tr. 545, 588, 1001-04. Xiong stated that he was still experiencing seizures about once or twice a week since taking Keppra. Tr. 1002. On February 16, 2011, Xiong saw Dr.

Rosenbloom related to his seizures and shoulder pain.  Tr. 553, 997.  Xiong reported that his seizures were getting better.  Tr. 998.  He described them as spells where he had "nightmares" while he slept.  Id.  Xiong also reported that he had been taking medication that helped improve his mood.  Id.  Xiong's behavior was appropriate; his strength was 5/5 in the upper and lower extremities, with poor effort shown in the upper left extremity; he showed normal coordination and reflexes; and demonstrated a normal gait.  Id.  Dr. Rosenbloom opined that Xiong's seizures are well-controlled and that his left side weakness was due to pain.  Tr. 998-99.  Dr. Rosenbloom opined that his claimed early morning seizures were actually nightmares.  Tr. 999.  Xiong was instructed to come back for checkup in three months and he was not placed on any new medications.  Tr. 553-54, 598-99, 999.  Dr. Rosenbloom also noted that Xiong was noncompliant with his seizure medication.  Tr. 999.

Xiong's February 15, 2011 HBC A1c value as at 6.3% with a goal of 6.9% or less.  Tr. 615.  Dr. Jhocson increased Xiong's dosage of Lantus and Xiong represented that his sugars were the 200s to 300s.  Tr. 615, 974-75.

On February 17, 2011, Xiong saw Georgi Kroupin, MA, LP, for psychotherapy.  Tr. 1000.  Xiong reported that he felt somewhat better than during the previous visit.[3]  Id.  He also reported decreased seizure activity.  Id.  Xiong had gone to California for the funeral of General Vang Pao, and saw many of his friends and people that he remembered from the war, which gave him strength.  Id.  Xiong was diagnosed with major depressive order, recurrent moderate.  Id.  The plan was to have Xiong practice his breathing exercises and to continue with psychotherapy.  Tr. 1000-01.

---

[3]     There are no records from Kroupin prior to this visit on February 17, 2011.  However, in connection with his reply, Xiong attached a letter from Kroupin, which stated that Xiong has been his patient since 2010.  See Docket No. 17.

On February 23, 2011, Xiong was seen by Dr. Jhocson for anemia and cirrhosis, and was prescribed Prilosec.  Tr. 547-48.  Xiong saw gastroenterologist Dr. Julie Ann Thompson on the same date, at which time he reported having no abdominal pain, no lower edema, no blood in his stool, and he was doing quite well overall.  Tr. 988-89. Xiong also did report having some trouble paying for some of his medications.  Tr. 988. Xiong was pleasant, well appearing, in no acute distress and his speech was fluent and clear.  Tr. 989.  There were no signs of muscle wasting or edema.  Id.

During a consult with a pharmacist on March 23, 2011, Xiong denied any symptoms of hypoglycemia, dizziness, weakness, muscle aches, seizures, or numbness in the extremities.  Tr. 982.  Xiong also reported that he had been exercising at a gym three times a week on average.  Id.  In addition, Xiong had not been taking medications related to the treatment of his seizures, diabetes, depression, gastric issues, anemia and diabetes.  Tr. 984-85.  On the same date, Xiong saw Kroupin for psychotherapy.  Tr. 987.  Xiong reported that his mood and sleep had improved since the last appointment.  Id.   Xiong claimed that he had been able to stop himself from worrying and being disappointed.  Id.  He was able to stay in contact with his friends, which made him happy.  Id.  He reported using progressive realization exercises, breathing exercises and going to the gym.  Id. He hoped to have a light duty job in the future.  Id. Xiong was diagnosed with major depressive order, recurrent unspecified.  Id. The plan was to continue with psychotherapy in order to help him deal with the stress surrounding his physical problems and past trauma.  Id.

On May 18, 2011, Xiong was seen by Dr. Jhocson primarily for his diabetes and for his anemia and post-traumatic stress disorder ("PTSD").  Tr. 615, 974.  Xiong's wife had just moved out of the house.  Tr. 974.  Dr. Jhocson's assessment included that

Xiong was suffering from diabetes and that he was no longer anemic.  Tr. 976.  No assessment was made as to depression or post-traumatic distress disorder.  Id.  On the same date, Xiong saw Kroupin for psychotherapy.  Tr. 979.  Xiong reported that he had been under significant stress because his wife left him.  Id.  Xiong was diagnosed with major depressive order, current moderate.  Id.  The plan was to continue with psychotherapy in order to help him deal with the stress surrounding his physical problems and the stress of his marital separation.  Id.

On May 25, 2011, Xiong saw Dr. Rosenbloom for a follow-up regarding his seizures.  Tr. 1126.  Xiong's seizure symptoms were under better control than his last visit, but that there was an issue with noncompliance as to his seizure medication.  Tr. 969.  Xiong stated that he had collapsed to the floor once and experienced incontinence.  Id.  He estimated that he had been out for two hours with no tongue biting.  Tr. 1126.  Xiong admitted to stopping the seizure medication after feeling better. Id.  Xiong's behavior was appropriate during the examination, and he was in no acute distress.  Tr. 1127.  Xiong showed normal motor function, with full strength to the upper and lower extremities.  Id.  Xiong's coordination, reflexes and gait were also normal.  Id. Dr. Rosenbloom agreed with Xiong that he should not work or drive for three months due to his seizures.  Tr. 969, 1126.

During a May 31, 2011 consult with a pharmacist, Xiong stated that his wife had recently left him.  Tr. 970.  It was also noted that his blood sugar levels had improved since the increased dosage of Lantus.  Id.  Xiong represented that he had no problems with his feet and denied any recent seizures.  Id.  Xiong also indicated that he was not regularly taking medications for his diabetes, depression, seizures and hypothyroidism. Tr. 972.

On June 13, 2011, Dr. Jhocson wrote a "To Whom it May Concern" letter in which he stated, "Ge Xiong is my clinic patient.  I consider him unable to drive due to his seizure condition, for which he is seeing Neurology.  I consider him unable to work due to his diabetes, cirrhosis, and major depression, and seizure disorder."  Tr. 650.

On June 21, 2011, Xiong was seen by Dr. Jhocson primarily for his diabetes and for his hypertension, anemia, folliculitis and athlete's foot.  Tr. 617.  It was reported during this appointment that Xiong's HBC A1c value on May 18, 2011 was at 6.8% with a goal of 7.3% or less.  Id.  Dr. Jhocson increased Xiong's dosage of Lantus.  Id.  Jhocson reported that Xiong's sugars had improved for a little bit, but were presently over 200.  Tr. 1120.  Xiong also complained of dizziness when getting up quickly.  Id.  On the same date, Xiong had a psychotherapy session with Kroupin.  Tr. 1125.  Xiong reported ongoing stress due to going through a divorce and financial problems.  Id.  Breathing exercises were used to help deal with the stress.  Id.  Xiong was diagnosed with major depressive disorder, current moderate.  Id.

On July 20, 2011, Xiong reported to a pharmacist that he was experiencing discomfort due to hemorrhoids and he had noticed some bleeding with his bowel movements.  Tr. 1115.  He also claimed that he experienced a seizure on July 2, when he fell out of bed.  Id.  Xiong stated that he exercised twice a day by walking 4-5 blocks.  Id.  It was noted that Xiong was not taking his medications for his diabetes, anemia and seizures on a regular basis.  Tr. 1117.

On July 29, 2011, Xiong was transferred to the hospital from his appointment with Dr. Jhocson due to complaints of weakness, fatigue, chest pain, shortness of breath upon exertion, intermittent bloody stools and acute blood loss as demonstrated by a change in his hemoglobin levels.  Tr. 762, 1112-14.  Xiong claimed that he had

experienced four seizure-like events in the past year, but that he had not sought medical attention and instead kept taking his Keppra medication.  Tr. 762.  Xiong was assessed with an acute blood loss secondary to gastrointestinal bleeding, and was given two units of blood.  Tr. 763.  Dr. Kreegan Reierson also believed that Xiong may have had some fainting spells related to gastrointestinal disease and acute blood loss.  Tr. 764.  Xiong was discharged from the hospital on August 1, 2011.  Tr. 758.  An upper endoscopy was performed that showed an upper gastrointestinal bleed secondary to a gastric ulcer.  Tr. 758-59, 774.  The gastric ulcer was clipped and given an epinephrine and coagulation injection to stop the bleeding.  Tr. 758, 769, 774.  Xiong was also suffering from bleeding hemorrhoids, which showed improvement with the use of a suppository and Tucks pads.  Id.  Dr. Reierson noted that there seemed to be an element of non-compliance with Xiong's diabetes treatment given the constancy of his hypoglycemia.  Tr. 760.  Dr. Reierson believed that Xiong had not suffered from any new seizure activity, and instead, any fainting spell symptoms were related to the loss of blood and his cardiac situation.  Tr. 758.

On August 3, 2011, Xiong met with a pharmacist regarding his medications.  Tr. 1107.  Xiong stated that he had felt better since his discharge and denied any recent bleeding.  Id.  Xiong noted that his hemorrhoids had improved and that he had experienced no new seizures.  Id.  He also denied any symptoms of hypoglycemia.  Id.  Xiong reported that he had been exercising by walking.  Id.  In addition, Xiong was not regularly refilling his medications related to his chronic anemia, diabetes and seizure disorder.  Tr. 1109.

On August 10, 2011, Xiong presented himself to the hospital with concerns of anemia and continued gastrointestinal bleeding.  Tr. 792.  He reported bloody stools,

mild gastric tenderness and some dizziness upon exertion.  Tr. 792.  His hemoglobin had dropped from 10.5 to 7.8 and he was admitted into the hospital.  Id.  An upper endoscopy showed a new larger ulcer that did not appear to be bleeding.  Tr. 788, 798, 801-02.  It was believed that Xiong's loss of blood was caused by a slow bleed from the ulcer and from his hemorrhoids.  Tr. 788, 799.  Xiong was discharged from the hospital on August 12, 2011, as his hemoglobin remained stable for 24 hours and his presenting symptoms had resolved.  Tr. 799.

On August 15, 2011, Xiong had a psychotherapy session with Kroupin for the stress he was experiencing due to the divorce with his wife and the sadness of ending the 26-year relationship.  Tr. 1101.  Xiong stated that he was able to stay strong by thinking about the future and by remembering how strong he was during the Vietnam War.  Id.  Xiong was diagnosed with a major depressive disorder, current moderate.  Id.

On August 18, 2011, Xiong saw Dr. Daniel Ries with complaints of blood in his stool.  Tr. 832.  While Dr. Ries noted that Xiong's past medical history included a major depressive disorder, he was at that time not on any antidepressants.  Id.  Xiong reported that his blood sugar had been running in the 200's and that he had not experienced any seizures as of late.  Id.  Upon examination, Dr. Reis found Xiong to be alert and not in any acute distress.  Tr. 833.  Xiong's hemoglobin was at approximately 7.5.  Id.  Dr. Ries believed that the blood in Xiong's stool was caused by hemorrhoids.  Id.  Dr. Ries's plan for Xiong was to receive a blood transfusion, and to have an upper endoscopy and colonoscopy performed the next day.  Id.  As Xiong reported that his blood sugar was not under control, Dr. Reis continued Xiong on the Lantus.  Id.  Dr. Ries found Xiong's seizures to be currently stable.  Id.  The August 19, 2011 upper endoscopy showed a healing gastric ulcer and the colonoscopy showed polyps,

diverticula, as well as internal hemorrhoids that could have been the source of the bleeding. Tr. 837-38, 839-40, 842. There was no active bleeding observed. Tr. 838, 839, 842.

On August 19, 2011, Xiong saw Dr. Reierson related to his gastrointestinal bleed. Tr. 829. Dr. Reierson found that Xiong could resume normal activities as tolerated. Id.

On August 25, 2011, Xiong saw Dr. Rosenbloom related to his July 29 and August 10, 2011 hospitalizations related to anemia secondary to gastrointestinal bleeding. Tr. 567. It was noted that he was found to have healing gastric ulcers and hemorrhoids. Id. Dr. Rosenbloom found Xiong's behavior was appropriate during his examination. Tr. 568. Xiong showed upper extremity strength of five out of five and lower extremity strength of at least 4+ out of five, and noted that Xiong was exhibiting poor effort as it related to his lower extremities. Id. Xiong also demonstrated normal coordination, sensation, reflexes and gait. Id. Dr. Rosenbloom noted that Xiong's August 19, 2011 colonoscopy was normal save for seven polyps, diverticulosis and internal hemorrhoids that most likely had bled, and that the procedure showed a healing gastric ulcer that was not at a high risk for bleeding. Tr. 568-69. Dr. Rosenbloom firmly believed that Xiong's recent episodes of "altered consciousness" were related to his fainting and not epileptic related. Tr. 569. Dr. Rosenbloom noted that Xiong exhibited no seizures during his hospitalizations and he had a low suspicion of any breakthrough seizures. Id.

On September 9, 2011, Dr. Jhocson reported that Xiong's anemia had improved and that Xiong was feeling better. Tr. 1088.

On September 16, 2011, Xiong met with a pharmacist regarding his medications. Tr. 1084. Xiong denied any symptoms of hypoglycemia or hyperglycemia, dizziness or

weakness, numbness of the extremities or problems with his feet, and had no complaints.  Id.  He also reported no further bleeding and that he was feeling stronger.  Id.  In addition, Xiong reported that he walked as tolerated.  Id.  It was also noted that Xiong was not regularly taking medications related to his diabetes, seizure disorder and his upper gastrointestinal bleeding.  Tr. 1086.

An October 3, 2011 EGD showed that Xiong's gastric ulcers had healed.  Tr. 878; 1082-83.

On October 4, 2011, Xiong met with a pharmacist regarding his medications.  Tr. 1077.  Xiong denied any symptoms of hypoglycemia, seizures, dizziness or weakness, numbness of the extremities or problems with his feet.  Tr. 1077-78.  Xiong also claimed that he missed some of his insulin doses because he was not always home.  Tr. 1078.  In addition, Xiong reported that he walked every day, he would walk in the park and he also went to a gym to exercise.  Id.  Xiong was at the set goal with regard to his diabetes management.  Tr. 1079.

On October 18, 2011, Dr. Katie Moriarty noted that Xiong's hemoglobin level was stable.  Tr. 855.

On October 19, 2011, Xiong was seen by Dr. Jhocson for his diabetes.  Tr. 634, 1073.  It was reported during this appointment that Xiong's July 29, 2011 and October 18, 2011 HBC A1cvalues were at 5.8 and 6.9% respectively, with a goal of less than 8.0% or less.  Tr. 634, 1076.  Id.  Xiong also had a psychotherapy session with Kroupin on October 19, 2011.  Tr. 1072.  Xiong reported that he felt worse than during his previous session.  Id.  Xiong had been going through a difficult divorce.  Id.  Xiong stated that he would do his best to stay in contact with his family and the community.  Id.  Xiong was diagnosed with a major depressive disorder, recurrent moderate.  Id.

On November 10, 2011, Xiong met with a pharmacist regarding his medications. Tr. 1067.  Xiong denied any symptoms of hypoglycemia or hyperglycemia, dizziness or weakness, numbness of the extremities or problems with his feet.  Id.  In addition, Xiong reported that he walked every day.  Id.  It was also noted that Xiong was not regularly taking medications related to his hypothyroidism, anemia, diabetes (including adjusting his dosage for insulin lower and not taking other medications), and seizures.  Tr. 1069. The pharmacist recommended a homecare nurse to ensure medication compliance.  Tr. 1071.

On December 9, 2011, Xiong met with a pharmacist regarding his medications. Tr. 1061.  Xiong stated that he was without medical insurance.  Id.  Xiong denied any symptoms of hypoglycemia or hyperglycemia, numbness of the extremities or problems with his feet.  Id.  Xiong reported that he walked every day.  Id.  The pharmacist noted noncompliance with insulin due to an inability to afford.  Tr. 1063.

On December 14, 2011, Xiong had epigastric pain and a drop in his hemoglobin level.  Tr. 882, 930, 1058-59.  His hemoglobin was slightly depressed from his previous number, but not significantly.  Tr. 937, 940.  Xiong denied lower abdominal pain, but was experiencing epigastric burning, mid-epigastric pain and some light headedness when he was active.  Tr. 889, 934, 938.  Xiong was admitted to the hospital.  Tr. 930, 1059.  Xiong underwent a flexible sigmoidscopy and an EGD that showed no ulcers in the stomach, a single ulcer in recto-sigmoid colon that was clipped, non-bleeding internal hemorrhoids, and non-thrombosed external hemorrhoids.  Tr. 882, 895, 930. There were signs of recent bleeding and a hemostatic clip was placed.  Tr. 882, 889.  It was believed that the hemorrhoids were the likely cause of the bleeding and anemia. Tr. 930, 937.  Xiong's hemoglobin remained stable during his hospitalization.  Id.  The

recommendation for treatment included a high fiber diet, a suppository, Prilosec and a colorectal band if bleeding continued.  Tr. 882, 895, 930-31.  It was noted that Xiong's diabetes was well controlled as of October 2011.  Tr. 937.  Xiong was discharged on December 16, 2011.  Tr. 930-31.

On December 22, 2011, Xiong reported to Dr. Jhocson that he was experiencing no further bleeding.  Tr. 1050.

On January 5, 2012, Xiong met with a pharmacist regarding his medications.  Tr. 1046.  Xiong claimed that he was without medical insurance, and was low on his medications for diabetes and Keppra due to the cost.  Tr. 1046, 1048.  Xiong denied any symptoms of hypoglycemia, dizziness or weakness, numbness of the extremities or problems with his feet.  Tr. 1046.  He also denied any abdominal discomfort or dark stools.  Id.  Xiong reported that he walked every day.  Id.

During a January 10, 2012 hematology consult with Dr. Thomas Yacovella, Xiong denied any new or worsening bleeding.  Tr. 950.  He did report occasionally having some bright red blood on the tissue paper after going to the bathroom, but attributed this to hemorrhoids.  Id.  Dr. Yacovella noted that there was evidence of alcohol abuse in the past year, which Xiong denied.  Id.  During his examination, Dr. Yacovella found that Xiong was not in distress, he was alert and ordinated, that he had no lower extremity edema and that he had a normal affect.  Tr. 952.  Dr. Yacovella also noted that Xiong's hemoglobin was stable and that his was "encouraging".  Tr. 953.

On January 25, 2012, Xiong again met with the pharmacist regarding his medications.  Tr. 1043.  Xiong reported that he was only checking his blood sugars once per week, and that he had been taking his insulin every other day, alternatively with his oral medications.  Id.  He denied any symptoms of hypoglycemia, claimed that

he had experienced a slight seizure two weeks earlier, stated he was without medical insurance, and complained of some stomach burning.  Id.

### D.    Hearing Before the Administrative Law Judge

Xiong appeared at a hearing before the ALJ on April 16, 2012.  Tr. 26.  Xiong testified that he received vocational training for working with metals when he first came to the United States.  Tr. 30.  Xiong claimed that while he could speak and read in English, it was difficult for him to remember English due to his seizures, despite the fact that he had filled out the disability application form in English.  Tr. 31-32.  Xiong testified that in 2010, he worked for a company picking papers up from clients and packaging them to be sent.  Tr. 32.  Xiong had to stand most of the time in order to perform his tasks.  Tr. 33.  He lifted on average five pounds at a time.  Id.  His position involved picking up envelopes, placing them in a box and then placing the filled boxes onto pallets.  Tr. 48.  Xiong also did some welding for his employer.  Tr. 48.  Xiong stated that he could no longer work because of his high blood pressure, diabetes, hemorrhoids, liver and lung condition, and his seizures.  Id.  According to Xiong, his seizures were occurring three to four times per week with medications.  Id.  He mostly recently had a seizure the previous day, causing him to fall and hurt his knees, but did not go to the emergency room.  Tr. 34.  Xiong claimed that his seizure condition was uncontrollable and he could not work because of his seizure condition.  Tr. 34-35.  He asserted that he could only stand for ten minutes at a time before feeling dizzy and then he would have to sit down, but he could only sit down for 30 minutes at a time.  Id.  Xiong testified that he had a lot of stress due to his divorce.  Tr. 36.  Xiong was required to borrow money from his relatives in order to pay his bills.  Tr. 37-38. Xiong's uncles would bring him over food and he used the microwave to heat the food up in order to

avoid having to use a stove with his seizure condition.  Tr. 38-39. He claimed that he

went without food some days because of his hunger and his seizures.  Tr. 39.  Xiong

stated he was unable to clean his house due to weakness in his hands and feet, he had

trouble putting on clothes because he felt like he was going to fall, and he gets help

from his relatives to get dressed.  Tr. 40.

The ME provided the following testimony regarding Xiong's impairments and the

limitations caused by these impairments:

> Q: Doctor, can you provide me your opinion as to whether
> the claimant is subject to any impairment or combination of
> impairments which would either meet or medically equal any
> of the listing impairments?
>
> A: The diabetes is under reasonably good control, according
> to 15F3 and 22F4 and 35Fll, and not associated with any
> ongoing deficits, and the -- we don't have good evidence that
> the seizure activity is anything other than infrequent, and
> probably mainly related to other medical conditions which
> have been addressed successfully. The liver condition is not
> at listing levels of documentation, and not addressing any
> psychiatric conditions, those would be the reasons there
> would not be a listing consideration.
>
> Q: Doctor, could you then provide me your opinion as to the
> work related limitations which would result from these
> impairments?
>
> A: I think his record generally describes someone who
> functions at the light range as far as lifting and time on feet.
> Additionally, there would be inability to work with hazardous
> machinery or unprotected heights. Those would be the kinds
> of limitations I'd see looking at the physical conditions in this
> record.

Tr. 45.

Following the testimony of the ME regarding Xiong's impairments, the ALJ gave

the VE the following hypothetical:

> I'm going to then ask you some hypothetical questions, and I
> want you to assume for the purposes of these questions that

we have an individual who is presently 52 years of age, so closely approaching advanced age, with no formal education, and in terms of ability to speak English, the record would suggest the ability to speak English, the claimant's testimony is otherwise, and work experience is described in your report. And this individual is impaired by a number of conditions, including what is- what's diagnosed as obesity, hypothyroidism, hypertension, seizure and seizure-like activity, insulin dependent diabetes, alcoholic cirrhosis, chronic anemia, chronic renal disease, at least a possibility of thoracic outlet syndrome, gastric ulcer, sinus tachycardia, and mental impairments which have been diagnosed as depression, anxiety, and alcoholism. Because of these impairments, in the first hypothetical question I want you to assume that this individual would be capable of light work exertionally, lifting up to 20 pounds occasionally, 10 pounds frequently, six hours of walking or standing, and two hours of sitting in an eight hour work day. This would be further restricted by the mental impairments to routine/repetitive, simple work.

Tr. 49-50.  The VE testified that such a person could work in his prior position in assembly as it is generally performed, involving standing for six hours out of an 8-hour work day, regardless of whether Xiong claimed he stood for eight hours a day at his position.  Tr. 50-51.

The ALJ then modified the hypothetical and asked the VE to assume the same physical limitations given by the ME, but with the additional limitation of experiencing seizures two to three times a week.  Tr. 52.  The VE testified that he believed that employers would not accept this medical condition.  Id.  In addition, the VE clarified that an individual that experienced weakness, which meant that he could only stand for ten minutes at a time, could not perform light work.  Id.

## V.   DISCUSSION

Xiong alleged multiple errors in the Commissioner's decision.   First, Xiong contended the ALJ erred by failing to use the "GRID rules" with regard to his physical or mental impairments.  See Plaintiff's Summary Judgment Response [Docket No. 9], p. 2.

Second, Xiong asserted that the Commissioner failed to acknowledge in her Answer to the Complaint the countless mental prescription drugs prescribed to him. Id., pp. 2-3. Third, Xiong maintained that just because the Commissioner did not grant him benefits based on his mental disorder impairment, did not mean that he was not suffering from such an impairment. Id., p. 3. Xiong noted that his mental disorder illness arose in circumstances, which gave support to his other claimed impairments, such as his seizures and diabetes. Id., pp. 3-4. Xiong also argued that the denial of benefits by the Commissioner has contributed to his depression. Id., p. 4.

Fourth, Xiong argued that the Commissioner unreasonably and willfully denied his seizure impairment claim without considering the overwhelming amount seizure records. Id., pp. 5-6. According to Xiong, he was experiencing convulsive seizures at least once a month for three consecutive months and non-convulsive seizures once a week for three consecutive months, which led him to become unconscious. Id., p. 5.

Finally, Xiong asserted that his claims related to mental disorder, seizure, diabetes and ulcer impairment are legitimate and supported by his doctors, including the fact that he has been getting medical treatment for these impairments since 2010. Id., p. 7.

Defendant countered that the Medical Vocation Guidelines are irrelevant to Xiong's case because the Grids are only considered at step five of the Commissioner's analysis, and Xiong's case was decided at step four, as he could perform his previous job as an assembler. See Defendant's Memorandum in Support of Motion for Summary Judgment [Docket No. 12], p. 5. Defendant also disputed Xiong's assertion that she never responded in her Answer to his claim that the records showed that he had taken prescription medications for his mental impairment, as he did not make such an

allegation in his Complaint, and in any event, the ALJ acknowledged that Xiong had taken medications for his depression. Id., p. 6.  Defendant acknowledged that the ALJ found that his depression was an impairment, but submitted that the question was whether that condition disabled him during the relevant period.  Id.  In addition, defendant argued that the allegation that the denial of benefits resulted in an exacerbation of his mental impairment, cannot factor into whether the Commissioner's decision was supported by substantial evidence.  Id., pp. 6-7.  Defendant claimed Xiong's allegation that the ALJ did not consider his seizures was without merit, as the evidence shows that the ALJ did consider his seizures, but ultimately concluded that it was not of such a severity that it precluded him from working in light of the effectiveness of his seizure medication.  Id., pp. 7-8.

In his reply, Xiong asserted the "GRID rule" applies to this case, and that the Commissioner violated his constitutional rights be denying him benefits in light of his mental health, seizures, bipolar condition, weakened arms and legs, back pain and PTSD, which allegedly even led to a hospitalization in December 2013.[4]  See Plaintiff's Reply

---

[4]     Xiong raised the ailments of being bipolar, weakened arms and legs, back pain and PTSD in his Reply Brief, as opposed to his initial memorandum. The Court generally does not consider arguments made for the first time in a reply. Britton v. Astrue, 622 F. Supp.2d 771, 790 (D. Minn. 2008).  In any event, the administrative record makes little to no mention of a bipolar condition, weakened arms and legs, back pain or PTSD.  Indeed, the record shows that his musculoskeletal and psychiatric reviews, coordination, reflexes and gait, along with leg and arm strength, were essentially normal. Tr. 349, 360, 362, 365, 371, 429, 568, 998, 1127.  Moreover, any assertion of extremity weakness or back pain during the relevant period is belied by Xiong's reports of exercise.  Tr. 425, 982, 987, 1061, 1067, 1078, 1084, 1107, 1115.  Further, there is only one mention of PTSD in the record by Dr. Jhocson, with no assessment of the disease being made. Tr. 615, 974, 976.  In addition, there were no limitations placed on Xiong based on any of these conditions by any medical provider.  Finally, this new evidence of such ailments from March 2013 and on was generated after the ALJ's April 2012 decision, and after Xiong initiated this action in February 2013.  Any new evidence submitted to the reviewing court must be material and must pertain to Xiong's condition on or before the date of the ALJs decision.  See Williams v.

Brife [sic] in Support of Motion for Summary Judgment [Docket No. 16], pp. 2-6.  Xiong also provided this Court with three exhibits—a letter from Kroupin dated August 2, 2012, stating that Xiong suffers from PTSD and severe depression, notes dated March 25, 2013 from a home health care provider, and an undated form signed by the same home health care provider addressing Xiong's bathing, dressing, grooming, transfers, mobility and positioning.[5]  Pl.'s Exhibits A-C [Docket No. 17].

The Court addresses each argument by Xiong within the framework of the five-step disability analysis.

### A.    Medical Vocation Guidelines and Allegations Missing from Defendant's Answer Regarding Xiong's Medications

Xiong is not entitled to relief based on his claim that defendant failed to apply the Medical Vocation Guidelines.  Having concluded that Xiong was capable of returning to his past relevant work finding at step four, it was not necessary for the ALJ to continue to step five--the step in the evaluation process where the Medical Vocation Guidelines would be applicable.  See Hepp v. Astrue, 511 F.3d 798, 127 (8th Cir. 2008) ("the ALJ clearly determined that Hepp was not disabled at step four, and the Medical–Vocation Guidelines are applied only at step five. Because he determined that Hepp was not disabled at step four, the ALJ did not need to reach step five.") (citation omitted); Bearden v. Astrue, NO. 4:11CV00170 BD, 2012 WL 1158751, at *9 (E.D. Ark. April 06, 2012).

---

Shalala, 905 F.2d 214, 216 (8th Cir. 1990) (citations omitted) ("Medical evidence obtained after an ALJ decision is material if it relates to the claimant's condition on or before the date of the ALJ's decision.").  The evidence, from essentially a year after the ALJ's decision, does not relate to the Xiong's condition during the relevant time period.  Thus, the Court will not consider the new evidence to determine whether the ALJ's decision is supported by substantial evidence in the record.

[5]      This form references "Service Dates" from April 25, 2013 to April 8, 2014.

Xiong is also not entitled to any relief based on his assertion that the Commissioner failed to acknowledge in her Answer to the Complaint the countless mental prescription drugs he was taking. There was no such allegation in the Complaint and therefore, no obligation by defendant to make any mention of his medications in her Answer.

**B.   Listings 12.04 and 12.06**[6]

While it is unclear by way of his motion, the Court believes that Xiong is arguing that his mental condition is so severe that the ALJ should have awarded him benefits. Indeed, the regulations provide that certain impairments are considered "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Such conditions are described in the Listing of Impairments, 20 C.F.R. § 404, Subpart P, Appendix 1. Depression is analyzed under Listing 12.04, affective disorders. See Randolph v. Barnhart, 386 F.3d 835, 840 (8th Cir. 2004) (analyzing major depressive disorder under Listing 12.04). Anxiety is analyzed under Listing 12.06. See George v. Astrue, 301 Fed. Appx. 581 (8th Cir. 2008).

Xiong has the burden of proof to establish that his impairments meet or equal a listing. Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004) (citing Sullivan v. Zebley, 493 U.S. 521, 530-31 (1990)). A listing is met when an impairment meets all of the listing's specified criteria. Id. (citing Sullivan, 493 U.S. at 530 ("An impairment that manifests only some of these criteria, no matter how severely, does not qualify.") A finding that an impairment or combination of impairments does not meet or equal a

---

[6]   The Court will not address Listing 12.09, pertaining to alcohol addiction, given Xiong's repeated denials in the record that he had not had a drink since 2002. See e.g., Tr. 36.

listing must be based on medical evidence.  <u>Shontos v. Barnhart</u>, 328 F.3d 418, 424

(8th Cir. 2003) (quoting 20 C.F.R. § 404.1526(a) and (b)).

        To meet Listings 12.04 and 12.06, paragraph A criteria (a set of medical findings)

and paragraph B criteria (a set of impairment-related functional limitations), must be

met.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A).  In addition, if paragraph B criteria

are not met, then a determination must be made as to whether the paragraph C criteria

are met.[7]  <u>Id.</u>  In other words, the paragraph C criteria are only addressed if the

paragraph B criteria are not satisfied.  <u>Id.</u> ("We will find that you have a listed

impairment if the diagnostic description in the introductory paragraph and the criteria of

both paragraphs A and B (or A and C, when appropriate) of the listed impairment are

satisfied.").

        Assuming that Xiong met the paragraph A criteria of Listings 12.04 and 12.06 –

that is, that he suffered from a severe depressive disorder and anxiety disorder – based

-----

[7]      To satisfy the C criteria of Listing 12.04, the claimant must show:

> a medically documented history of a chronic affective
> disorder of at least 2 years' duration that has caused more
> than a minimal limitation of ability to do basic work activities,
> with symptoms or signs currently attenuated by medication
> or psychosocial support, and one of the following:
>
> 1.  Repeated episodes of decompensation, each of
>     extended duration; or
>
> 2.  A residual disease process that has resulted in such
>     marginal adjustment that even a minimal increase in
>     mental demands or change in the environment would be
>     predicted to cause the individual to decompensate; or
>
> 3.  Current history of 1 or more years' inability to function
>     outside a highly supportive living arrangement, with an
>     indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C).  .

on the ALJ's findings (Tr. 11), the Court still finds that the paragraph B and C criteria have not been met.  To meet the paragraph B criteria of Listings 12.04 and 12.06, Xiong must prove that his depression or anxiety, separately or together, resulted in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(B), 12.06(B).  "Marked" is defined as more than moderate, but less than extreme.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C).  "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitations is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis."  Id.

### 1.   Restrictions of Plaintiff's Activities of Daily Living

The SSA regulations define "activities of daily living" as follows:

> Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.

> We do not define "marked" by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function. For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions.

<u>See</u> 20 CFR Pt. 404, Subpt. P, App. 1, § 12.00(C)(1) (Mental Disorders, Assessment of Severity).

In his functional report dated August 10, 2010, Xiong indicated that he had no problem with caring for himself, although he needed reminders regarding changing his clothes, taking medications, grooming and shaving.  Tr. 214, 218.  While he claimed that he could not cook for himself, he was able to go shopping for food.  Tr. 214, 218-19.  On May 7, 2010, during his assessment at the hospital, Xiong reported that there had been no changes in his activities of living and that he could independently eat, engage in activity and take care of his hygiene.  Tr. 349.  He also reported to many providers that he actively exercised, including walking on a daily basis and going to a gym (in some instances three days a week).  Tr. 422, 425, 982, 987, 1046, 1061, 1067, 1078, 1084, 1107, 1115.  In addition, there is evidence that he engaged in yard work at his house.  Tr. 981.  Further, no medical provider ever indicated that Xiong could not take care of himself or restricted his daily activities based on his mental impairments.  To the contrary, Xiong's psychotherapist encouraged him to take his mental therapy treatment into his own hands by practicing relaxation and breathing exercises at home, and Xiong represented to the psychotherapist that he went to the gym to alleviate his stress. Tr. 1000, 987.

This Court has no doubt that Xiong's marital problems, health issues and financial situation were stressful to him and contributed to his depression and anxiety.  Nevertheless, his ability to care for himself, along with the activities he engaged in outside of the home, including shopping and exercising, substantiates the ALJ's determination that he was not markedly impaired in his activities of daily living.  For all of these reasons, based on the record as a whole, the Court concludes that the ALJ's

finding that Xiong had a mild restriction in activities of daily living was based on substantial evidence in the record.

### 2.    Difficulties in Maintaining Social Functioning

The SSA regulations define "social functioning" as follows:

> Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.
>
> We do not define "marked" by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function. For example, if you are highly antagonistic, uncooperative, or hostile but are tolerated by local storekeepers, we may nevertheless find that you have a marked limitation in social functioning because that behavior is not acceptable in other social contexts.

See 20 CFR Pt. 404, Subpt. P, App. 1, § 12.00(C)(2) (Mental Disorders, Assessment of Severity).

The ALJ found that Xiong had mild difficulties in social functioning.  Tr. 13.  The Court concludes that the ALJ's finding is supported by substantial evidence in the record.

Xiong stated in his August 2010 functional report that he had a short temper, could not handle stress, could not go out with friends and family, could not get along with his boss like he used to and had problems with handling changes in his routine. Tr. 221, 222. At the same time, he indicated that he socialized with friends and talked with relatives once or twice a week, and he would go to a flea market on a regular basis. Tr. 220. The record also reflected that Xiong left a hospital in order to attend a cultural and religious ceremony. Tr. 351. In addition, Xiong reported to this psychotherapist that he was able to stay in contact with his friends, which made him happy. Tr. 987. Xiong travelled to California for the funeral of General Vang Pao and saw many of friends and people from the war, which gave him strength. Tr. 1000. Xiong stated that despite his divorce, he would do his best to stay in contact with his family and the community. Tr. 1072. Medical providers noted that his behavior was always appropriate and that he had a normal affect during his examinations. Tr. 568, 952, 998, 1127. During the hearing before the ALJ, Xiong testified that he was in constant contact with his relatives who provided him with care and money. Tr. 37-38, 40.

The record as a whole demonstrates that Xiong actively and appropriately interacted with other individuals. No medical provider indicated that Xiong had any trouble interacting with others. Instead, his providers found his behavior was appropriate. Further, it is evident by the record that Xiong had ongoing relationships with friends and family, and that these social interactions were a source of support for him.

For all of these reasons, the Court concludes that the ALJ's finding that Xiong had a mild restriction in social functioning was based on substantial evidence in the record.

### 3.      Difficulties in Maintaining Concentration, Persistence or Pace

The SSA regulations define concentration, persistence, or pace as follows:

> Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.

> On mental status examinations, concentration is assessed by tasks such as having you subtract serial sevens or serial threes from 100. In psychological tests of intelligence or memory, concentration is assessed through tasks requiring short-term memory or through tasks that must be completed within established time limits.

> In work evaluations, concentration, persistence, or pace is assessed by testing your ability to sustain work using appropriate production standards, in either real or simulated work tasks (e.g., filing index cards, locating telephone numbers, or disassembling and reassembling objects). Strengths and weaknesses in areas of concentration and attention can be discussed in terms of your ability to work at a consistent pace for acceptable periods of time and until a task is completed, and your ability to repeat sequences of action to achieve a goal or an objective.

> We do not define "marked" by a specific number of tasks that you are unable to complete, but by the nature and overall degree of interference with function. You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks. Deficiencies that are apparent only in performing complex procedures or tasks would not satisfy the intent of this paragraph B criterion. However, if you can complete many simple tasks, we may nevertheless find that you have a marked limitation in concentration, persistence, or pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions.

See 20 CFR Pt. 404, Subpt. P, App. 1, § 12.00(C)(3) (Mental Disorders, Assessment of Severity).

The ALJ determined that Xiong had a moderate impairment in the ability to maintain concentration, persistence or pace.  Tr. 13.  The record as a whole supports this determination.

Xiong stated in his August 2010 Adult Function Report that he needed reminders regarding changing his clothes, taking medications, grooming and shaving.  Tr. 214, 218.  He also noted that he could not pay bills but he could count change; he could handle a savings account but was unable to handle a checking account.  Tr. 218-19.  Xiong claimed that he could only pay attention for 3-5 minutes at a time, and had trouble following written and spoken instructions.  Tr. 221.  Additionally, on November 10, 2011, a pharmacist recommended a homecare nurse to ensure Xiong's medication compliance, which suggested he needed reminders with regard to taking his medications.  Tr. 1071.

On the other hand, in the August 2010 function report, Xiong stated that he did not need reminders to go places, which is supported by his extensive medical treatment and no indication that he missed any of his appointments.  Tr. 220.  Further, there were no medical findings that Xiong had difficulty with concentration, persistence, or pace, or any such limitations placed on him in the workplace.  Moreover, there is nothing in the medical records linking his depression or anxiety to his lack of concentration or persistence or pace.  On review of the record as a whole, the Court concludes that the ALJ's finding that Xiong had a moderate impairment in his ability to maintain concentration, persistence and pace is supported by substantial evidence in the record.

### 4.    Repeated Episodes of Decompensation

There is no evidence of any decompensation for an extended duration (i.e., hospitalization, or suicidal ideation) as a result of Xiong's depression or anxiety disorder.  Thus, the substantial evidence in the record supports the ALJ's finding that Xiong did not experience repeated episodes of decompensation, each of extended duration.[8]

### 5.    "C" Criteria of Listings 12.04 and 12.06

The ALJ's finding that Xiong does not meet the C Criteria of Listings 12.04 and 12.06 is supported by substantial evidence in the record.  There is nothing in the medical records suggesting that Xiong's depression or anxiety has resulted in any decompensation or that his mental conditions have contributed to any inability to function outside a highly supportive living arrangement.  Indeed, as of August 18, 2011, Xiong represented that he was no longer on any antidepressants.  In sum, the record does not support such a serious mental impairment so as to satisfy the C Criteria of Listings 12.04 and 12.06.

### 6.    Conclusion

For all the reasons stated above, the Court finds that the ALJ's determination that Xiong's depression did not meet or equal Listings 12.04 and 12.06 is supported by substantial evidence in the record.

### C.    Residual Functional Capacity Determination

A claimant's RFC is what he or she can do despite his or her limitations.  20 C.F.R. § 416.945(a)(1).  The ALJ must determine a claimant's RFC by considering

---

[8]    The phrase "repeated episodes of decompensation, each of extended duration" means "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4).

the combination of the claimant's mental and physical impairments.  See Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003).  However, it is the claimant's burden, not the Commissioner's, to prove the RFC.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).

In determining a claimant's RFC, the ALJ must consider all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations.  Id.  The RFC determination must be supported by "medical evidence that addresses claimant's ability to function in the workplace[.]"  Baldwin, 349 F.3d at 556 (quoting Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)).  However, the ALJ is not limited solely to consideration of medical evidence, "but is required to consider at least some supporting evidence from a professional."  Baldwin, 439 F.3d at 556 (citing 20 C.F.R. § 404.1545(c)).

The ALJ must consider every medical opinion received, (20 C.F.R. §§ 404.1527(c); 416.927(c)), and the ALJ must resolve the conflicts among the various opinions and reject those conclusions if they are inconsistent with the record as a whole.  Heino v. Astrue, 578 F.3d 873, 879 (8th Cir. 2009).  A treating physician's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record; on the other hand, an ALJ need not accept the treating physician's opinion if it does not meet those criteria.  Clevenger v. Social Sec. Admin., 567 F.3d 971, 974 (8th Cir. 2009).

"By contrast, '[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.'"  Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (quoting Kelley v. Cunningham, 133 F.3d 583,

589 (8th Cir. 1998)).   However, there are circumstances "in which relying on a non-treating physician's opinion is proper."  Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010).   When a treating physician's RFC opinion is not substantially supported by the objective evidence, the ALJ may rely on the opinions of consulting physicians when those opinions are more consistent with the record as a whole.  Casey v. Astrue, 503 F.3d 687, 694 (8th Cir. 2007).

The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician.  Hamilton, 518 F.3d at 610 (citing 20 C.F.R. § 404.1527(d)(2)).   Consequently, whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight.  Id. (citing Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions."  Id., (quoting Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001)).

An ALJ may consider opinions from non-examining sources on the nature and severity of a claimant's impairments, including those opinions from State agency medical and psychological consultants.  See 20 C.F.R. § 416.927(e)(2)(i).

As discussed above, the ALJ assigned Xiong a light work RFC.  The ALJ also included within the RFC the limitations that Xiong's employment could not involve exposure to unprotected heights or hazards, and that he would be further restricted by his mental impairments to routine, repetitive, simple work.  Tr. 14.

While it is unclear, the Court believes that Xiong is asserting that his seizure disorder, diabetes, mental disorder and ulcer impairment conditions do not support the

RFC determined by the ALJ, and the resulting finding he could perform his past employment.

On May 25, 2011, Dr. Rosenbloom agreed with Xiong that he should not work or drive for three months due to his seizures.  Tr. 696, 1126.  In addition, on June 13, 2011, Dr. Jhocson wrote a "To Whom it May Concern" letter in which he stated, "Ge Xiong is my clinic patient.  I consider him unable to drive due to his seizure condition, for which he is seeing Neurology.  I consider him unable to work due to his diabetes, cirrhosis, and major depression, and seizure disorder."  Tr. 650.

"A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."  Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008) (quoting Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citation omitted)); see also Randolph, 386 F.3d at 839 (as it pertains to the Listings, under the applicable regulations, the "ALJ will give 'a treating source's opinion on the issue[s] of the nature and severity of [an] impairment[ ]' controlling weight if such opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'") (quoting 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2)).  However, "[a] treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement."  Hamilton, 518 F.3d at 610 (citing Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996)); see also Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991) (holding that the weight given to a treating physician's opinion is limited if the opinion consists only of conclusory statements).  Moreover, "a treating physician's opinion that a claimant is

'disabled' or 'unable to work,' does not carry 'any special significance,' because it invades the province of the Commissioner to make the ultimate determination of disability." Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009) (quoting 20 C.F.R. §§ 416.927(e)(1), (3)) (citation omitted).

The Court finds that ALJ was not required to give controlling weight to the opinions of Dr. Rosenbloom or Dr. Jhocson, given they are conclusory in nature and the opinion that Xiong cannot work invades the Commissioner's power to make the ultimate determination of disability.

In addition, the opinions of Dr. Rosenbloom and Dr. Jhocson that Xiong could not work because of his seizures are not supported by their treating records and the record as a whole. Consequently, the Court finds that the ALJ did not error in failing to give those opinions substantial weight. See Howe v. Astrue, 499 F.3d 835, 839 (8th Cir. 2007) ("[A] treating physician's opinion is afforded less deference when the medical evidence in the record as a whole contradicts the opinion.") (citation and marks omitted).

In particular, the medical records demonstrate that on July 23, 2010, Xiong was admitted to Regions Medical Center for a reported seizure at work and he experienced a seizure while in the emergency room. Tr. 318, 330. Xiong had no previous history of seizures and no further seizures while he was in the hospital. Tr. 318-19. Dr. Papic believed that the seizures were secondary to Xiong's electrolyte abnormalities due to dehydration and poor oral intake over the previous days, as opposed to a neurological disorder. Tr. 319, 326-27. Dr. Papic instructed Xiong at the time of his discharge on July 25, 2010, that he could resume normal activities, and he could return to normal work activities. Tr. 321. On October 27, 2010, Xiong had EEG that was abnormal and

suggested a focal area of cerebral dysfunction in the left temporal lobe, and that the possibility of a lowered seizure threshold existed.  Tr. 442, 459, 512.   However a subsequent head MRI on November 1, 2010, showed no acute problems and no structural or migrational abnormalities.  Tr. 448, 487, 661.  On February 16, 2011, Xiong reported to Dr. Rosenbloom that his seizures were getting better.  Tr. 553, 997-98.  He described the siezures as spells where he had "nightmares" while he slept.  Id.  Dr. Rosenbloom opined that Xiong's seizures are well-controlled.   Tr. 998-99.   Dr. Rosenbloom further opined that Xiong's claimed early morning seizures were actually nightmares.  Tr. 999.  At that examination, Dr. Rosenbloom noted that Xiong had been non-complaint with his seizure medications.  Tr. 969, 999.

During a March 23, 2011 consult with a pharmacist, Xiong denied experiencing any seizures.  Tr. 982.  In addition, Xiong had not been taking medications related to the treatment of his seizures.  Tr. 984-85.  While Xiong reported to Dr. Rosenbloom on May 25, 2011, that he had collapsed to the floor once and experience incontinence, he had admitted to stopping the seizure medication after feeling better.  Tr. 1126.  During a May 31, 2011 consult with a pharmacist, Xiong denied any recent seizures and also reported that he had not been regularly taking his seizure medication.  Tr. 970.  On July 20, 2011, Xiong reported to a pharmacist that he experienced a seizure on July 2, and he fell out of bed, but that he was not taking his medications for his seizures on a regular basis.  Tr. 1115, 1117.  On July 29, 2011, Xiong stated that he had experienced four seizure-like events in the past year, but that he had not sought medical attention.  Tr. 762.  On August 3, 2011, Xiong represented that he had not experienced any recent seizures, and was not regularly refilling his seizure medications.  Tr. 1107, 1109.  On August 18, 2011, Xiong stated that he had not had any seizures as of late and Dr. Ries

found Xiong's seizure disorder to be currently stable.  Tr. 832-33.  On August 25, 2011, Dr. Rosenbloom noted that Xiong exhibited no seizures during his hospitalizations, he had a low suspicion of breakthrough seizures, and opined that his most recent episodes of "altered consciousness" were related to fainting, as opposed to being epileptic in nature.  Tr. 569.  On October 4, 2011 and November 10, 2011, Xiong denied any seizure activity and it was noted that he had failed to take his seizure medication.  Tr. 1077-79, 1067, 1069.  On January 25, 2012, Xiong reported to his pharmacist that he had a slight seizure two weeks earlier, but there were no records showing that he sought medical attention.  Tr. 1043.

In sum, the record shows that the first seizure on July 23, 2010, is the only confirmed seizure episode in the records.  The remaining claims of seizures were based on Xiong's reports.  As to these reports, Dr. Rosenbloom believed that Xiong was experiencing nightmares as opposed to seizure activity, opined that Xiong's seizures were well-controlled (as did Dr. Reis), and that he had low suspicion of any breakthrough seizures.  Further, Dr. Rosenbloom, along with other medical providers, noted that Xiong was noncompliant with his seizure medication on numerous occasions, with Xiong even stating at one point that he stopped taking the medication because he felt better, thereby contradicting any assertion that the condition was uncontrollable.  See Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) (quotation omitted) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling."); see also Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010) (noncompliance with medication is a valid reason for discrediting a claimant's subjective complaints).  Nevertheless, despite the dearth of objective medical evidence to support Xiong's claim regarding the severity and frequency of his seizures, the ALJ took into

account the seizures, as is evidenced by the limitation that Xiong was not allowed to work with any hazards or heights.  For all the reasons stated above, the Court finds that substantial evidence in the record the ALJ's limitation in the RFC as it relates to Xiong's seizures.[9]

_____

[9]    While Xiong never asserted that he met the Listings for epilepsy, in light of his claim that he was experiencing convulsive seizures at least once a month for three consecutive months and non-convulsive seizures once a week for three consecutive months, which led him to become unconscious, (Pl.'s Mem., p. 5), the Court briefly addresses this Listings 11.02 or 11.03.

Listings 11.02 and 11.03 require all of the following medical findings in order for a claimant to be found disabled at step three of the sequential evaluation process:

> 11.02 Epilepsy—convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment. With:
>
> A. Daytime episodes (loss of consciousness and convulsive seizures) or
>
> B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.
>
> 11.03 Epilepsy—nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. Part 404, Subpart P. appendix 1, §§ 11.02, 11.03.  The criteria for epilepsy can be applied "only if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment." Id., § 11.00(A).

Until July 23, 2010, Xiong had Xiong had no previous history of seizures.  Tr. 318-19, 330.  Over a year later, on July 29, 2011, Xiong reported that he had experienced four seizure-like events in the past year, but that he had not sought medical attention. Tr. 762.  The next mention of a seizure by Xiong is in a January 25, 2012 report to his pharmacist that he had a slight seizure two weeks earlier.  Tr. 1043.

As for his diabetes, there is no dispute that Xiong suffered from diabetes and that he was taking medication in order to control his blood sugar, although his medication compliance was poor. However, there is nothing in the record supporting the assertion that he was suffering from significant limitations caused by his diabetes that would affect his ability to work. To the contrary, by his own reports, Xiong denied that he was experiencing any symptoms due to his diabetes. Tr. 422, 425, 982, 1043, 1046, 1061, 1067, 1084, 1077-78, 1107. In addition, the ME testified that Xiong's diabetes was not associated with any ongoing deficits. Tr. 45. As such, the Court concludes that substantial evidence in the record supports the limitations afforded by the ALJ as it related to Xiong's diabetes.

Regarding Xiong's depression and anxiety, for the reasons set forth in this Court's analysis of Listing 12.04 and 12.06, the Court finds that the ALJ properly took into account Xiong's mental impairments with regard to the RFC. At any rate, based on Xiong's moderate limitation as to concentration, persistence, or pace, the ALJ included in the RFC a limitation to routine, repetitive, and simple work. Tr. 14.

With regard to Xiong's ulcer impairment, there is evidence in the record that his May 7, 2010, Xiong's hospitalization with iron deficiency anemia may have been caused by an ulcer. Tr. 292-93, 306, 386. Over a year later, on July 29, 2011, Xiong was again hospitalized due to anemia related to a gastric ulcer. Tr. 758-59, 774. Further, Xiong

---

Although Xiong claimed at the hearing before the ALJ that he was experiencing seizures three to four times per week with medications, the medical record lends no support to this testimony. Rather, it supports the finding that he was not experiencing a seizure once a month for three months as it relates to convulsive seizure, or once a week for a period of three months as it pertains to nonconvulsive seizures. Tr. 48. Moreover, even if Xiong met the necessary number of seizure events required by the Listings, the record shows that Xiong was not compliant with his seizure medication. Thus, the Court concludes that the ALJ did not error in concluding that Xiong's seizure disorder did not meet the Listings.

was hospitalized again on August 10, 2011, and a new ulcer was discovered, however, it did not appear to be bleeding, and it was unclear if the bleeding was caused by the ulcer or hemorrhoids.  Tr. 788, 798-99.  On August 18, 2011, tests showed that his ulcer had been healing and was not at a high risk for bleeding.  Tr. 832-33, 839-40, 568-69. Finally on December 14, 2011, Xiong was hospitalized due to anemia.  Tr. 930, 1059. An ulcer in recto-sigmoid colon was discovered, which was not bleeding, although there were recent signs of bleeding as well as bleeding hemorrhoids.   However, it was believed that the hemorrhoids and not the ulcer was the most likely cause of the bleeding and anemia.  Tr. 930, 937.  There have been no other reports of ulcers or complications from bleeding.

To the contrary, as of January 10, 2012, it was reported that Xiong's hemoglobin was stable and Xiong denied any dizziness as of January 2012.  Tr. 953, 1046.  There is no statement by Xiong's medical providers that he was limited by anemia secondary to his ulcers.  The ME opined that more recently, Xiong's hemoglobin had risen and that his ulcer had apparently healed.  Tr. 44.  Given that Xiong's ulcers have resolved, and there is no evidence of ongoing bleeding from any ulcers, the Court concludes that substantial evidence in the record supports the ALJ only limiting Xiong to a light RFC with no exposure to any hazards.

In sum, taking into account any impairment's from Xiong's seizures, diabetes, mental impairments and ulcer condition, the Court finds that the the RFC for Xiong is supported by substantial evidence in the record.

## VI.   CONCLUSION

For the reasons discussed above, the Court concludes that substantial evidence in the record supports the ALJ's determination that Xiong did not meet or equal Listings

12.04 and 12.06.   Substantial evidence in the record also supports the ALJ's weighing of the medical opinions and ultimately, his RFC determination.   Finally, the vocational expert's testimony that Xiong can perform his past employment constitutes substantial evidence to support the ALJ's determination that Xiong is not disabled within the meaning of the Social Security Act.

## VI.   RECOMMENDATION

For the reasons set forth above,

IT IS RECOMMENDED THAT:

1.     Plaintiff's Motion for Summary Judgment [Docket No. 9] be **DENIED** and

2.     Defendant's Motion for Summary Judgment [Docket No. 11] be **GRANTED**.

Dated:       January 21, 2014


s/ *Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge




Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 4, 2014**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.   A party may respond to the objecting party's brief within ten days after service thereof.   All briefs filed under this Rules shall be limited to 3500 words.   A judge shall make a de novo determination of those portions to which objection is made.   This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.